1 | Todd D. Carpenter, Cal. State Bar No. 234464
todd@lcllp.com
2 | Jennifer M. French, Cal. State Bar No. 265422
jennf@lcllp.com
3 | **LYNCH CARPENTER, LLP**
9171 Towne Centre Drive, Suite 180
4 | San Diego, California 92122
Telephone: 619-762-1900
5 | Facsimile: 858-313-1850

6 | *Attorneys for Plaintiffs*
*and the Putative Class*

7

8 | **UNITED STATES DISTRICT COURT**

9 | **SOUTHERN DISTRICT OF CALIFORNIA**

10

11 | CARRIE CALCAGNO and PRAVEEN PATHANGI, individually and on behalf of all others similarly situated,

Case No. **'25CV2661 GPC DEB**

12 | **CLASS ACTION COMPLAINT for:**

13 | Plaintiffs,

14 | v.

1) Violation of California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200–17208);

15 | THE SCOTTS COMPANY, LLC and DOES 1–20,

2) Violation of California's False Advertising Law (Cal. Bus. & Prof. Code §§ 17500–17509); and

16

17 | Defendants.

3) Violation of California's Consumer Legal Remedies Act (Cal. Civ. Code §§ 1750–1784).

18

19 | **DEMAND FOR JURY TRIAL**

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT

## I.    **INTRODUCTION**

1.      This consumer class action arises out of The Scotts Company, LLC's false advertising of its Miracle-Gro organic soil and fertilizer products (the Products). Scotts falsely represents that the Products are organic even though they contain synthetic, non-organic, and harmful forever chemicals known as perfluoroalkyl and polyfluoroalkyl substances (PFAS).

2.      Scotts uses the term organic to induce consumers into believing that the Products contain only naturally occurring, non-synthetic ingredients and are therefore a superior alternative to competing—and less expensive—products that are not labeled as organic. Reasonable consumers do not expect Scotts's organic Products to contain toxic forever chemicals like PFAS, especially when marketed for use in residential gardens to grow fruits and vegetables. Scotts fails to disclose that PFAS are present in its Products because it knows that this likely would influence their purchasing decisions to Scotts's financial detriment.

3.      Plaintiffs Carrie Calcagno and Praveen Pathangi and Class members would not have purchased, or would have paid less money for, Scotts's organic Products had they known that the Products contain PFAS. Scotts's misleading, deceptive, and false advertising, and its unlawful, unfair, and fraudulent business practices, caused Calcagno, Pathangi, and Class members to purchase, purchase more of, or pay more for the Products than they would have but for Scotts's misrepresentations.

## II.    **PARTIES**

4.      Calcagno and Pathangi are California consumers who relied on Scotts's false advertisements to purchase the Products, and they bring this action on behalf of themselves and all those similarly situated.

5.      Carrie Calcagno resides in La Mesa, California. On or about March 20, 2025, Calcagno purchased Scotts's Miracle-Gro Organic Raised Bed & Garden Soil and Miracle Gro Organic Outdoor Potting Mix from the Target store located at 5500 Grossmont Center Drive, La Mesa, CA 91942. Calcagno reviewed the labels on the

Miracle-Gro Organic Raised Bed & Garden Soil and Miracle-Gro Organic Outdoor Potting Mix bags and relied on the representations that the Products were organic when she decided to purchase them. Calcagno would not have purchased the Products had she known that they contained inorganic PFAS.

6. Calcagno continues to desire to purchase organic soil and believes she would purchase organic soil if they were truly organic and did not contain PFAS. She would purchase one of Scotts's Products again if she could have confidence regarding the truth of its advertisements. But because of Scotts's ongoing false, deceptive, and misleading advertising, Calcagno will be unable to rely on the advertising and packaging when deciding in the future whether to purchase Scotts's organic soil Products. She will be harmed if, in the future, she is left to guess whether Scotts's Products contain ingredients like PFAs and whether the Products are worth the prices charged.

7. Praveen Pathangi resides in San Diego, California. In February or March of 2025, Pathangi purchased Scotts's Miracle-Gro Organic Raised Bed & Garden Soil from the Home Depot store located at 10604 Westview Parkway, San Diego, CA 92125. Pathangi reviewed the label on the Miracle-Gro Organic Raised Bed & Garden Soil bag and relied on the representation that the soil was organic when he decided to purchase it. Pathangi would not have purchased the Miracle-Gro Organic Raised Bed & Garden Soil had he known that it contained inorganic PFAS.

8. Pathangi continues to desire to purchase organic soil and believes he would purchase organic soil if they were truly organic and did not contain PFAS. He would purchase one of Scotts's Products again if he could have confidence regarding the truth of its advertisements. But because of Scotts's ongoing false, deceptive, and misleading advertising, Pathangi will be unable to rely on the advertising and packaging when deciding in the future whether to purchase Scotts's organic soil Products. He will be harmed if, in the future, he is left to guess whether Scotts's Products contain ingredients like PFAs and whether the Products are worth the prices charged.

9.     Class members will also continue to purchase the Products, reasonably, but incorrectly, believing that they are organic, based on the unlawful conduct alleged herein.

10.     Defendant The Scotts Company, LLC is a limited liability company organized and existing under the laws of the State of Ohio, with its headquarters and principal place of business at 14111 Scottslawn Road, Marysville, Ohio 43040. Scotts directly, and through its agents, has substantial contacts with, and receives substantial benefits and income from and through, California.

11.     Calcagno and Pathangi are unaware of the true names or capacities of the Defendants sued herein under the fictitious names Does 1 through 20 but pray for leave to amend and serve such fictitiously named Defendants once their names and capacities become known.

12.     Calcagno and Pathangi allege on information and belief that the named and Doe Defendants were: (1) acting as express agents, implied agents, ostensible agents, servants, partners, and/or employees of each other; (2) acting within the scope of and under such agency and employment, and with the full knowledge, consent, permission, approval, and ratification, either express or implied, of each of the other Defendants and benefited from the actions of every other Defendant, thereby adopting such conduct and actions as their own; (3) acting as each other's alter egos; and (4) aiding and abetting and offering substantial assistance to each other in the commission of the alleged wrongful acts.

13.     Calcagno and Pathangi are informed and believe, and based thereon allege, that each Defendant is in some manner intentionally, negligently, or otherwise responsible for the acts, omissions, occurrences, and transactions alleged herein.

### III.    JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the amount in controversy exceeds $5 million, there are more than 100 proposed Class members, and minimal diversity is met. Calcagno and Pathangi are each California citizens, and Scotts is a citizen of Ohio.

15.     This Court has personal jurisdiction over Scotts because it regularly conducts business in the State of California. Scotts has marketed, promoted, and sold its Products in California throughout the Class Period (i.e., the statute of limitations preceding the filing of this action).

16.     Venue is proper under 28 U.S.C. § 1391(b)(2) and California Civil Code § 1780(d) because a substantial part of the events or omissions giving rise to Calcagno and Pathangi's claims occurred while Calcagno and Pathangi resided in this judicial district.

## IV.    FACTUAL ALLEGATIONS

### A.    PFAS Are Not Organic

17.     Merriam-Webster's Dictionary defines organic as "of, relating to, or derived from living organisms."[1] The common understanding of the phrase "organic fertilizer" refers to ingredients that are derived or harvested from once-living plants or animals.[2] In California, "natural organic fertilizer" means "materials derived from either plant or animal products" that "shall not be mixed with synthetic materials."[3]

18.     PFAS are highly resistant synthetic chemicals used in widespread industrial and consumer products since the 1940s.[4] In 2024, the U.S. Environmental Protection Agency declared the two most studied and produced types of PFAS—perfluorooctanoic acid (PFOA) and perfluorooctane sulfonate (PFOS)—as dangerous substances.[5]

19.     PFAS persist and bioaccumulate in the food chain when released into the environment and build up in the body when humans consume PFAS-contaminated food

---

[1] *Organic*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/organic (last visited Oct. 6, 2025).

[2] Sally Reill, *A Guide to Understanding Fertilizers*, OSU Extension Service (pub. Jan. 2019, reviewed 2024), https://extension.oregonstate.edu/gardening/techniques/guide-understanding-fertilizers.

[3] Cal. Food & Agric. Code § 1548.

[4] *PFAS Explained*, U.S. EPA 1 (2024), https://www.epa.gov/system/files/documents/2023-10/final-virtual-pfas-explainer-508.pdf.

[5] Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C.A. § 9602(a); 40 C.F.R. § 302.4, App. A; Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances, 89 Fed. Reg. 39,124-01, 39,125 (May 8, 2024).

or water or are otherwise exposed to PFAS.[6] Exposure to PFAS, even at low parts-per-trillion (ppt), can build up in the human body over time and cause severe adverse health effects.[7] Because of the cumulative effect, even a de minimus amount of PFAS exposure can negatively impact health.[8]

20.    The United States Department of Agriculture's (USDA) National Organic Program develops and enforces national standards for organic crops, livestock, and agricultural products sold in the United States.[9] Agricultural products are any commodity or product derived from livestock marketed for either human or livestock consumption.[10] The USD standards do not apply to non-food products, including soils and fertilizers, and the USDA does not regulate the use of "organic" for non-food products.[11] Nevertheless, non-food products like soil and fertilizers can meet non-government, privately maintained standards that rely on the USDA regulations, like those created by the Organic Material Review Institute (OMRI).[12]

---

[6] Sibel Barisci & Rominder Suri, *Occurrence and Removal of Poly/Perfluoroalkyl Substances (PFAS) in Municipal and Industrial Wastewater Treatment Plants*, 84(12) Water Science & Tech. 3442, 3443 (2021), https://pdfs.semanticscholar.org/3b10/37f0c12ad3757c8ffd0922cff95ab36ecb46.pdf.

[7] *See* Rabia Amen, et al., *A Critical Review on PFAS Removal from Water: Removal Mechanism and Future Challenges*, 15 Sustainability 16173, at 1–3 (2023), https://www.mdpi.com/2071-1050/15/23/16173/pdf; *see also* U.S. National Institute of Environmental Health Sciences, *Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS)* (Mar. 6, 2025), https://www.niehs.nih.gov/health/topics/agents/pfc; Cleveland Clinic, *What Are Forever Chemicals (PFAS)? 5 Ways Forever Chemicals (PFAS) May Affect Your Health* (June 6, 2024), https://health.clevelandclinic.org/what-are-forever-chemicals-pfas.

[8] *PFAS Explained*, *supra* note 4, at 1; *see also* Molly M. Ginty & Courtney Lindwall, *"Forever Chemicals" Called PFAS Show Up in Your Food, Clothes and Home*, Nat'l Res. Def. Council (updated Apr. 10, 2024), https://www.nrdc.org/stories/forever-chemicals-called-pfas-show-your-food-clothes-and-home.

[9] USDA Agriculture Marketing Service, *National Organic Program*, https://www.ams.usda.gov/about-ams/programs-offices/national-organic-program (last visited Oct. 6, 2025); *see also* USDA Agriculture Marketing Service, *USDA Certified Organic: Understanding the Basics*, https://www.ams.usda.gov/services/organic-certification/organic-basics (last visited Oct. 6, 2025).

[10] Organic Foods Production Act of 1990, 7 U.S.C. § 6502.

[11] OMRI, *What We Do*, https://www.omri.org/what-we-do (last visited Oct. 6, 2025).

[12] *Id.*

21.    Under USDA regulations, "organic matter" means the "remains, residues, or waste products of any organism."[13] And the USDA defines "organic fraud" as the "deceptive representation, sale, or labeling of nonorganic agricultural products or ingredients as 100 percent organic, organic, or made with organic [ingredients]."[14]

22.    The USDA maintains a National List of Allowed and Prohibited Substances for organic production.[15] In general, the National List allows nonsynthetic materials and prohibits the use of synthetic materials.[16] The National List does not identify any "allowed" PFAS.

23.    Put simply, PFAS do not fall within any definition of organic, and no reasonable customer purchasing organic soil or fertilizer would expect their organic product to contain PFAS.

**B.    Scotts's Products Contain Inorganic PFAS**

24.    The Products at issue in this case consist of all Scotts Miracle-Gro soil and fertilizer products with packaging that represents they are organic. The Products include but are not limited to: Miracle-Gro Organic Raised Bed & Garden Soil, Miracle-Gro Organic Outdoor Potting Mix, Miracle-Gro Organic Indoor Potting Mix, Miracle-Gro Organic Garden Soil, Miracle-Gro Organic Potting Mix, Miracle-Gro Organic Raised Bed Soil, Miracle-Gro Performance Organics All Purpose Container Mix, Miracle-Gro Performance Organics In-Ground Soil, Miracle-Gro Performance Organics Raised Bed Mix, Miracle-Gro Organic Choice Potting Mix, Miracle-Gro Organic Choice Raised Bed & In Ground Soil with Compost, and Miracle-Gro Organic Choice Garden Soil.

25.    During their investigation, Calcagno and Pathangi conducted laboratory tests of various Products with the assistance of qualified expert technicians and consultants. The consultants and internal investigators purchased various Products from over a dozen

---

[13] 7 C.F.R. § 205.2.

[14] *Id.* (citation modified).

[15] 7 C.F.R. §§ 205.600–205.602.

[16] 7 C.F.R. §§ 205.601, 206.602; *see also* USDA Agriculture Marketing Service, *The National List of Allowed and Prohibited Substances*, https://www.ams.usda.gov/rules-regulations/organic/national-list (last visited Oct. 6, 2025).

different locations in Northern and Southern California, New York, New Jersey, and Oregon in 2024 and 2025 (the Sample Products). They transported the Sample Products to lab technicians while following proper chain-of-custody procedures, and the technicians securely tested the Sample Products for PFAS. Calcagno and Pathangi's team also secured, sampled, transported, and tested Calcagno and Pathangi's own Products (the Plaintiffs' Products).

26.    Calcagno and Pathangi's experts used EPA Method 1633A to test all Sample Products. The EPA and Department of Defense developed EPA Method 1633A to analyze PFAS in various environmental samples, including soil.[17] The experts compared their results with the EPA's Soil Screening Guidance, designed to help environmental and science professionals evaluate contaminated soil.[18] Generally, if contaminate concentrations fall below identified soil screening levels (SSLs), CERCLA does not require any further action or study.[19]

27.    The laboratory tested for PFAS in Scotts's Products by comparing their results to the EPA Regional Screening Levels (RSLs), EPA Risk-based SSLs, and EPA Maximum Contaminant Level (MCL)-based SSLs for each type of PFAS.

28.    Testing revealed that each of Scotts's organic Products contained numerous PFAS, many of which exceeded the EPA's RSLs and SSLs. In other words, under the EPA's guidance, the levels of PFAS found in Scotts's Products could trigger further action or study under CERCLA. And none of the Products are organic, despite Scotts's advertised claims.

---

[17] U.S. EPA, *Method 1633, Revision A: Analysis of Per- and Polyfluoroalkyl Substances (PFAS) in Aqueous, Solid, Biosolids, and Tissue Samples by LC-MS/MS* at 1 (Dec. 2024), https://www.epa.gov/system/files/documents/2024-12/method-1633a-december-5-2024-508-compliant.pdf.

[18] U.S. EPA Office of Emergency & Remedial Response, *USEPA Soil Screening Level Guidance* at 1 (July 1996), https://semspub.epa.gov/work/HQ/175238.pdf.

[19] *Id.*

*Miracle-Gro Organic Raised Bed & Garden Soil*

29.    Testing of the Miracle-Gro Organic Raised Bed & Garden Soil Sample Products revealed the presence of multiple PFAs, including PFOA and PFOS, and the PFOA and PFOS results exceeded applicable RSLs and SSLs.

30.    Tests of Plaintiffs' Products revealed similar results to the Sample Products:

a.    Calcagno's Miracle-Gro Organic Raised Bed & Garden Soil tested positive for multiple PFAS, including PFOA and PFOS. And the PFOA and PFOS results both exceeded applicable RSLs and SSLs.

b.    Similarly, Pathangi's Miracle-Gro Organic Raised Bed & Garden Soil tested positive for multiple PFAS, including PFOA and PFOS. The PFOA and PFOS results also exceeded applicable RSLs and SSLs.

31.    These analytical results indicate that the Miracle-Gro Organic Raised Bed & Garden Soil Product is not organic because it contains PFAS—two of which have been designated by the EPA as hazardous substances under CERCLA—which are not related to or derived from living organisms.

*Miracle-Gro Organic Outdoor Potting Mix*

32.    Tests revealed the Miracle-Gro Organic Outdoor Potting Mix Soil Sample Products revealed the presence of multiple PFAs, including PFOA and PFOS, and the PFOA and PFOS results exceeded applicable RSLs and SSLs.

33.    Tests of Calcagno's Miracle-Gro Organic Outdoor Potting Mix Soil revealed similar results to the Sample Products. It tested positive for multiple PFAS, including PFOA and PFOS, and the PFOA and PFOS results both exceeded applicable RSLs and SSLs.

34.    These analytical results indicate that the Miracle-Gro Organic Outdoor Potting Mix Product is not organic because it contains PFAS—two of which have been designated by the EPA as hazardous substances under CERCLA—which are not related to or derived from living organisms.

### *Miracle-Gro Organic Indoor Potting Mix*

35.    Tests revealed that Miracle-Gro Organic Indoor Potting Mix contains multiple PFAs, including PFOA and PFOS. When present, the PFOA and PFOS results exceeded applicable RSLs and SSLs.

36.    These analytical results indicate that the Miracle-Gro Organic Outdoor Potting Mix Product is not organic because it contains PFAS—two of which have been designated by the EPA as hazardous substances under CERCLA—which are not related to or derived from living organisms.

### *Miracle-Gro Performance Organics All Purpose Container Mix*

37.    Tests revealed that Miracle-Gro Performance Organics All Purpose Container Mix contains multiple PFAs, including PFOA and PFOS, and the PFOA and PFOS results exceeded applicable RSLs and SSLs.

38.    These analytical results indicate that the Miracle-Gro Performance Organics All Purpose Container Mix Product is not organic because it contains PFAS—two of which have been designated by the EPA as hazardous substances under CERCLA—which are not related to or derived from living organisms.

### *Miracle-Gro Performance Organics In-Ground Soil*

39.    Tests revealed that Miracle-Gro Performance Organics In-Ground Soil contains multiple PFAs, including PFOA and PFOS, and the PFOA and PFOS results exceeded applicable RSLs and SSLs.

40.    These analytical results indicate that the Miracle-Gro Performance Organics In-Ground Soil Product is not organic because it contains PFAS—two of which have been designated by the EPA as hazardous substances under CERCLA—which are not related to or derived from living organisms.

C.    **Scotts's False and Deceptive Advertising**

41.    On the packaging, Scotts advertises to consumers that the Products are organic soil and/or fertilizers, safe to use on edible plants and residential gardening. These representations for each Product are false.

42.     For example, the packaging of Miracle-Gro Organic Raised Bed & Garden Soil appears as follows:



43.     On the front of the package, Scotts markets Miracle-Gro Organic Raised Bed & Garden Soil as an organic soil with natural fertilizer and implies that it is safe for use on fruit and vegetable plants by providing images of tomatoes, peppers, and strawberries surrounded by soil.

44.     On the back, Scotts markets the Miracle-Gro Organic Raised Bed & Garden Soil as "Successful Organic Gardening Made Attainable."

45.     On both sides of the packaging, Scotts also includes a prominent a logo from the OMRI, indicating that the Products are "OMRI Listed for Organic Use."

 

46.     Images of packaging from each of the Products are attached to this complaint as Exhibit A.

47.     As discussed above, OMRI is a third-party, nonprofit organization that purports to verify the substances used in organic production, including soil and fertilizers. Companies like Scotts obtain OMRI verification through a self-reporting application process from the companies seeking to use its label.[20] OMRI charges initial and annual company and product fees for the use of its "OMRI Listed" label.[21] The Company Fees vary according to the Company's Annual Gross Sales, with Initial Review Fees ranging from $610 to $7,500 and Annual Renewal Fees from $395 to $4,700.[22] Multi-ingredient

---

[20] OMRI, *What to Expect*, https://www.omri.org/suppliers/review-requirements (last visited Oct. 6, 2025.)

[21] OMRI, *Review Cost*, https://www.omri.org/review-cost (last visited Oct. 6, 2025).

[22] *Id.*

products like Scotts's have an initial review fee of $1,010 and an annual review fee of $655.[23] OMRI charges annual product fees for each company product, including products that are repackaged and marketed under a different name without any modification.[24]

48.     OMRI uses the definitions from the USDA National List of Allowed and Prohibited Substances when verifying whether a company's self-reported ingredients comply with its standards.[25] If one of those ingredients is synthetic—like PFAS—it would have to be allowed on the National List for the product to receive OMRI's stamp of approval.[26] But even though PFAS are not allowed on the National List, Calcagno and Pathangi are informed and believe that OMRI does not test for PFAS as part of their process. Scotts's use of the OMRI "Listed for Organic Use" adds to the deception and false advertisement of the Products as organic.

49.     Scotts's marketing, advertisements, and representations that its Products are organic and non-synthetic are false, misleading, and deceptive. Scotts sells soil and fertilizer products made with ingredients that it knows, or should have known, contain PFAS. And Scotts fails to disclose and/or conceals the presence of PFAS in its Products, fails to warn consumers of their harms, and falsely advertise its Products as organic despite the presence of PFAS.

## V.     CLASS ALLEGATIONS

50.     Calcagno and Pathangi bring this action on behalf of themselves, and all others similarly situated, under Federal Rule of Civil Procedure 23 and seek certification of the following Class:

> All persons who purchased any of the Products in the State of California for their personal use within the applicable statute of limitations period.

---

[23] *Id.*

[24] *Id.*

[25] OMRI, *What We Do*, *supra* note 11.

[26] USDA Agriculture Marketing Service, National Organic Program, *Guidance Classification of Materials* (NOP 5033), https://www.ams.usda.gov/sites/default/files/media/NOP-5033.pdf (last visited Oct. 6, 2025).

51.     The proposed Class excludes Scotts's current or former officers, directors, and employees; counsel for the parties; and the judicial officer to whom this lawsuit is assigned.

52.     There is a well-defined community of interest in the litigation, and the Class is easily ascertainable:

a.     Numerosity: The members of the proposed Class are so numerous that joinder of all members is impracticable. Calcagno and Pathangi are informed and believe that the proposed Class contains hundreds of thousands of individuals who have been damaged by Scotts's conduct. Calcagno and Pathangi do not know the precise number of proposed Class members.

b.     Typicality: Calcagno and Pathangi's claims are typical of the Class claims because all Class members have been deceived (or were likely be deceived) by Scotts's false and misleading implied advertising claims about the true chemical composition and ingredients contained in its Products. Calcagno and Pathangi advance the same claims and legal theories on behalf of themselves and all Class members.

c.     Adequacy: Calcagno and Pathangi will fairly and adequately protect the interests of the Class. They have retained counsel experienced in complex consumer class action litigation and intend to prosecute this action vigorously. Neither Calcagno nor Pathangi have antagonistic or adverse interests to those of the Class.

d.     Superiority: The nature of this action and the nature of the laws available to Calcagno, Pathangi, and the Class make the use of the class action format a particularly efficient and appropriate procedure to afford relief to themselves and the Class for the wrongs alleged. The damages or other financial detriment suffered by individual Class members is miniscule compared to the burden and expense that would be entailed by individual litigation of their claims against Scotts. It would thus be virtually impossible for Calcagno, Pathangi, and

CLASS ACTION COMPLAINT

the Class to obtain effective redress for the wrongs done to them on an individual basis.

       e.    <u>Public Policy Considerations</u>: Absent the class action, the Class and the public would not likely recover, or would not likely have the chance to recover, damages and/or restitution, or receive injunctive relief, and Scotts will, and will continue to, retain the proceeds of its fraudulent and deceptive misdeeds. A class action serves the important public policy considerations underlying the statutes and the legislature's intent in enacting them.

53.    This action involves common questions of law and fact that predominate over any questions affecting individual proposed Class members, including:

       a.    whether Scotts misrepresented material facts and/or failed to disclose material facts in connection with the packaging and advertising of the Products;

       b.    whether Scotts's use of false or deceptive packaging and advertising constituted false or deceptive advertising;

       c.    whether Scotts engaged in unfair, unlawful, and/or fraudulent business practices;

       d.    whether Scotts's conduct, as alleged herein, was intentional and knowing;

       e.    whether Calcagno, Pathangi, and the Class are entitled to damages and/or restitution and in what amount;

       f.    whether Scotts is likely to continue false, misleading, or unlawful conduct such that an injunction is necessary; and

       g.    whether Calcagno, Pathangi, and the Class are entitled to an award of reasonable attorney's fees, interest, and costs of suit.

54.    Scotts engaged in a common course of conduct giving rise to the violations of the legal rights that Calcagno, Pathangi, and the Class seek to uniformly enforce. The claims involve similar or identical statutory violations, business practices, and injuries. The injuries sustained by Calcagno, Pathangi, and the Class flow, in each instance, from a

common nucleus of operative fact—namely, Scotts's deceptive packaging and advertising of the Products as organic. Each instance of harm suffered by Calcagno, Pathangi, and the Class is a direct result of a single course of illegal conduct. Scotts exposed each Class member to the same or substantially similar deceptive practices, as the packaging of each Product bears the same representation (that the Product is organic). Individual questions, if any, are eclipsed by the numerous common questions presented in this action.

55.     Scotts has also acted, or failed to act, on grounds generally applicable to Calcagno, Pathangi, and the Class, supporting the imposition of uniform relief to ensure compatible standards of conduct towards the members of the Class.

## VI.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION
Violation of California's Unfair Competition Law
Cal. Bus. & Prof. Code §§ 17200–17208

56.     Calcagno and Pathangi repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

57.     Under California's Unfair Competition Law (UCL), an unfair business competition includes any unlawful, unfair, or fraudulent act or practice, as well as any unfair, deceptive, untrue or misleading advertising.[27]

58.     Calcagno and Pathangi have standing to pursue this claim because they have suffered injury-in-fact and have lost money or property because of Scotts's unlawful, unfair, and fraudulent actions. As described above, Calcagno and Pathangi purchased the Products for their own personal use in reliance on Scotts's false representations that the Products contained only organic ingredients and were therefore healthier, safer, and more environmentally friendly than the non-organic soil fertilizer alternatives. Instead, the Products contained synthetic, non-organic, and toxic PFAS. As a result of Scotts's

---

[27] Cal. Bus. & Prof. Code § 17200.

CLASS ACTION COMPLAINT

misrepresentations, Calcagno and Pathangi expended money in the transaction that they otherwise would not have had they known Scotts's advertising claims were false.[28]

### Unfair Prong

59.    A business act or practice is unfair under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications, and motives of the practice against the gravity of the harm to the alleged victims.[29]

60.    Scotts's conduct constitutes an unfair business practice because, as alleged above, Scotts engaged in a false advertising campaign to mislead consumers into believing that by purchasing Scotts's organic soil and/or fertilizer Products, they were receiving a product that only contained organic ingredients. There is no societal benefit from false advertising—only harm. Calcagno, Pathangi, and the Class members paid for an organic product that is not actually organic. While Calcagno, Pathangi, and the Class were harmed, Scotts was unjustly enriched by its false representations and omissions. Scotts thus violated established public policy in support of truth in advertising, and engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

61.    Scotts's conduct harms the interests of consumers and market competition, and there is no valid justification for its conduct.

### Fraudulent Prong

62.    A business act or practice is fraudulent under the UCL if it is likely to deceive members of the consuming public.[30]

63.    Scotts engaged in a fraudulent business practice by knowingly representing to consumers that the Products were organic and were thus safer and healthier than

---

[28] *See infra* ¶¶ 5–8.

[29] *Ticconi v. Blue Shield of Cal. Life & Health Ins. Co.*, 160 Cal. App. 4th 528, 539 (2008) (citations omitted).

[30] *Schnall v. Hertz. Corp.*, 78 Cal. App. 4th 1144, 1167 (2000).

CLASS ACTION COMPLAINT

potential alternative products sold without these claims. Scotts's deceptive business practices deceived Calcagno, Pathangi, and the Class who purchased the Products in reliance on Scotts's false representations and advertisements.

64.    Scotts knew, or should have known, that its material misrepresentations and omissions would be likely to deceive and harm the consuming public and result in consumers making payments to Scotts for organic Products that are not, in fact, organic.

65.    This practice is devoid of utility and functions only to maximize Scotts's profits at the expense of the consuming public. The gravity of harm to Calcagno, Pathangi, and the Class who lost money or property by paying for the Products far outweighs any benefit Scotts gained through its practice.

### *Unlawful Prong*

66.    A business act or practice is unlawful under the UCL if it violates any other law or regulation.[31]

67.    Scotts's actions, as alleged herein, constitute illegal and unlawful practices committed in violation of California's Food and Agricultural Code, which regulates the production and sale of organic fertilizer.[32] Fertilizer is misbranded if "its labeling is false or misleading in any particular way."[33] A fertilizer is adulterated if "its composition falls below or differs from that which it is purported to possess by its labeling" or if "an organic input material contains ingredients that, in type or amount, do not comply with the requirements of the National Organic Program standards."[34] As noted above, the Food and Agricultural Code defines an organic fertilizer as one made of materials "derived from either plant or animal products" that "shall not be mixed with synthetic materials."[35] And the USDA Organic Program's National List of Allowed and Prohibited

---

[31] *Cel–Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999).

[32] Cal. Food & Agric. Code § 14502.

[33] *Id.* § 14681(a).

[34] *Id.* § 14682(b), (e).

[35] *Id.* § 1548.

Substances does not identify any "allowed" PFAS.[36] Scotts's marketing of the Products as organic therefore violates the California's Food and Agricultural Code and the UCL.

68.    Scotts's actions, as alleged herein, also violate California's False Advertising Law (FAL), as discussed further in Calcagno and Pathangi's Second Cause of Action.

69.    Additionally, Scotts's actions, as alleged herein, constitute illegal and unlawful practices committed in violation of California's Consumer Legal Remedies Act (CLRA), as discussed further in Calcagno and Pathangi's Third Cause of Action.

70.    Each of Scotts's unfair, fraudulent, and unlawful practices enumerated above was the direct and proximate cause of financial injury to Calcagno, Pathangi, and the Class. Scotts has unjustly benefitted because of its wrongful conduct. Calcagno, Pathangi, and the Class are accordingly entitled to restitution from Scotts of all monies it wrongfully obtained from them as a result of the conduct alleged herein.

### SECOND CAUSE OF ACTION
Violation of California's False Advertising Law
Cal. Bus. & Prof. Code §§ 17500–17509

71.    Calcagno and Pathangi repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

72.    Calcagno and Pathangi have standing to pursue this claim because they suffered injury-in-fact and have lost money or property as a result of Scotts's unlawful, unfair, and fraudulent actions, as alleged above.

73.    Under the FAL, it is unlawful for a corporation to make any statement with intent to dispose of personal property that "is *untrue* or *misleading*, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . . ."[37]

---

[36] 7 C.F.R. §§ 205.601, 206.602; *see also* USDA Agriculture Marketing Service, *The National List of Allowed and Prohibited Substances*, https://www.ams.usda.gov/rules-regulations/organic/national-list (last visited Oct. 6, 2025).

[37] Cal. Bus. & Prof. Code § 17500 (added emphasis).

CLASS ACTION COMPLAINT

74.    The required intent is the intent to dispose of property, not the intent to mislead the public in the disposition of such property.

75.    Scotts violated the FAL by publicly disseminating false, misleading, and unsubstantiated advertisements that the Products are organic.

76.    Scotts made its false and misleading advertisements to increase the sales of the Products. Scotts knew, or should have known, its advertisements for the Products were false and misleading. And Scotts knew, or should have known, that consumers, including Calcagno, Pathangi, and the Class, would believe that a soil or fertilizer labeled organic would be free from synthetic, non-organic chemicals like PFAS.

77.    Calcagno, Pathangi, and the Class have suffered harm as a result of Scotts's violations of the FAL because they have paid monies for the Products that they otherwise would not have paid but for Scotts's false and misleading statements.

78.    Scotts is aware, or, by the exercise of reasonable care, should have been aware, that the above representations were false and/or misleading. Calcagno, Pathangi, and the Class have suffered injury-in-fact and have lost money as a result of Scotts's false representations and false advertising.

79.    Accordingly, Calcagno, Pathangi, and the Class seek an order awarding class-wide restitution of all monies wrongfully acquired by Scotts.

### THIRD CAUSE OF ACTION
Violation of California's Consumer Legal Remedies Act
Cal. Civ. Code §§ 1750–84

80.    Calcagno and Pathangi repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

81.    As alleged herein, Calcagno and Pathangi have standing to pursue this claim because they have suffered injury-in-fact and have lost money or property as a result of Scotts's unlawful, unfair, and fraudulent actions, as alleged above.

82.    The California legislature enacted the CLRA to protect consumers against unfair and deceptive business practices. The CLRA applies to Scotts's acts and practices because the Act covers transactions involving the sale of goods to consumers.

83. Calcagno, Pathangi, and the Class are consumers under the CLRA,[38] and they engaged in transactions under the Act, including the purchases of the Products.[39] Scotts is a person under the CLRA,[40] and the Products are qualified goods.[41]

84. Scotts's unfair and deceptive business practices were intended to and did result in the sale of the Products.

85. Scotts violated the CLRA by engaging in the following unfair and deceptive acts and practices:

> (5) Representing that [the Products] have . . . characteristics . . . [and] benefits . . . that they do not have . . .
>
> (7) Representing that [the Products] are of a particular standard, quality, or grade . . . if they are of another.
>
> (9) Advertising [the Products] with intent not to sell them as advertised.
>
> (16) Representing that [the Products] have been supplied in accordance with a previous representation when [they have] not.[42]

86. Scotts violated the CLRA by representing that its Products are organic, when, in reality, the Products contain synthetic, non-organic chemicals like PFAS.

87. Scotts knew or should have known that its organic representations were false and misleading and by omitting the presence of PFAS in its Products, it was omitting a material fact that would alter any consumer's decision to purchase the Products.

88. Scott's violations of the CLRA proximately caused an injury in fact to Calcagno, Pathangi, and the Class.

89. Calcagno, Pathangi, and the Class purchased Scotts's Products on the belief that they would have the advertised properties (i.e., that they were in fact organic). If Calcagno, Pathangi, and the Class had known that Scotts's Products did not contain the

---

[38] Cal. Civ. Code § 1761(d).

[39] *Id.* §§ 1761(e), 1770(a).

[40] *Id.* § 1761(c).

[41] *Id.* § 1761(a).

[42] *Id.* § 1770(a)(5), (7), (9), (16) (citation modified).

CLASS ACTION COMPLAINT

advertised high quality organic ingredients, and instead contained toxic and synthetic PFAS, they would not have purchased the Products. Indeed, no consumer would purchase an organic product unless they believed the product was organic.

90.    As a direct and proximate result of Scotts's conduct, Calcagno, Pathangi and the Class suffered injury and damages in an amount to be determined at trial.

91.    On information and belief, Scotts's actions were willful, wanton, and fraudulent.

92.    On information and belief, Scotts's officers, directors, and/or managing agents authorized the use of the misleading statements and material omissions regarding the Products.

93.    Calcagno and Pathangi filed the required declaration of venue with this complaint.[43]

94.    Calcagno, Pathangi, and the Class are consumers who have suffered economic injury and damages as a result of Scotts's unfair and deceptive business practices alleged herein. Calcagno and Pathangi therefore seek an order enjoining such methods, acts, or practices and an order for restitution and disgorgement on behalf of themselves and the California Subclass, as well as any other relief the Court deems proper.[44] Calcagno and Pathangi additionally seek costs and reasonable attorney's fees.[45]

95.    On October 7, 2025, Calcagno and Pathangi, through counsel, sent a CLRA demand letter to Scotts on behalf of themselves and all other similarly situated consumers. The letter was sent via certified mail, return receipt requested, and provided notice of Scotts's violation of the CLRA. It demanded that Scotts correct, repair, replace, or otherwise rectify the unlawful, unfair, false, and deceptive practices complained of herein. The letter also stated that if Scotts refused to do so, Calcagno and Pathangi would file a complaint seeking damages in accordance with the CLRA. If Scotts fails to fully rectify the wrongs described in this letter and to provide notice to all affected consumers

---

[43] Cal. Civ. Code § 1780(d).

[44] *Id.* § 1782(d).

[45] *Id.* § 1780(e).

within 30 days following receipt, Calcagno and Pathangi intend to seek all legal damages available under the CLRA.[46]

## VII.   **PRAYER FOR RELIEF**

For these reasons, Calcagno and Pathangi pray for judgment against Scotts as follows:

a.      certifying the Class, appointing Calcagno and Pathangi as Class Representatives, and appointing their counsel as Class Counsel;

b.      ordering restitution and disgorgement of all profits and unjust enrichment that Scotts obtained from Calcagno, Pathangi, and the Class as a result of its unlawful, unfair, and fraudulent business practices;

c.      awarding Calcagno, Pathangi, and the Class all applicable actual and punitive damages;

d.      awarding declaratory and injunctive relief as permitted by law or equity, including enjoining Scotts from continuing the unlawful practices as set forth herein, and directing Scotts to identify, with Court supervision, victims of its conduct and pay them all money it is required to pay;

e.      ordering Scotts to engage in a corrective advertising campaign;

f.      ordering Scotts to pay attorney's fees and litigation costs;

g.      ordering Scotts to pay both pre- and post-judgment interest on any amounts awarded; and

h.      ordering such other and further relief as may be just and proper.

## VIII.  **DEMAND FOR JURY TRIAL**

Calcagno and Pathangi demand a trial by jury of all claims so triable.

Dated: October 7, 2025

By:    */s/ Jennifer M. French*
Jennifer M. French, Cal. State Bar No. 265422
Email: jennf@lcllp.com

*Attorneys for Plaintiffs and the Putative Class*

---

[46] Cal. Civ. Code § 1782(a), (e).

CLASS ACTION COMPLAINT